UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANDREW LIPIAN,

                Plaintiff,

v.

UNIVERSITY OF MICHIGAN, ET AL.

                Defendants.

_____/

Case No. 18-13321

SENIOR U.S. DISTRICT JUDGE
ARTHUR J. TARNOW

U.S. MAGISTRATE JUDGE
ELIZABETH A. STAFFORD

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS [178]; GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [203]; AND DENYING AS MOOT DEFENDANTS' MOTION TO STRIKE [247]**

Plaintiff, Andrew Lipian, is a former vocal student at the University of Michigan School of Music, Theatre and Dance ("SMTD"). Plaintiff alleges that a professor at SMTD, David Daniels, sexually harassed him throughout his training, and, in March 2017, sexually assaulted him. He argues that the University ignored repeated warnings that Daniels was sexually aggressive towards students, took complaints of sexual harassment and assault against male students less seriously than those against female students, and ultimately retaliated against him for filing suit.

Defendants have moved to dismiss the case under Rule 12(b)(6) and Rule 56 of the Federal Rules of Civil Procedure. Their motions will be granted as to Counts II-VIII of the Third Amended Complaint but denied as to Count I.

## FACTUAL BACKGROUND

The Factual Background will cite to both the Third Amended Complaint ("TAC"), for purposes of the motion to dismiss, and the factual record, for purposes of the motion for summary judgment.

### Lipian, Daniels, and the University of Michigan

David Daniels and Andrew Lipian are both countertenor vocalists. They met in October of 2012, when Daniels taught a master class at University of Michigan ("UM") at which Lipian was a student. (Lipian Dep., July 2, 2019, pg. 43, PageId.5863).

Former defendant, David Daniels, age 52, was hired to teach at the University's SMTD (his alma mater) in fall of 2015. (TAC ¶ 18; Dkt. 203-16; PageId.6180). Daniels had been a professional opera singer and recording artist for two decades, but he had no teaching experience. He was promoted on the University's website for his operatic achievements. It noted, for instance, that Daniels was the first countertenor to give a solo recital in the main auditorium of

Carnegie Hall. [1] (TAC ¶ 21). He was also given an expedited path to tenure, and, in his offer of employment on April 9, 2015, he was informed that his tenure review would be conducted in 2017-2018. (Dkt. 203-16, PageId.6180). The Executive Committee of the SMTD "enthusiastically recommend[ed]" his faculty appointment, effective September 1, 2015, noting that he has sung at the best opera houses of the world and been deemed the "most acclaimed countertenor of the day, perhaps the best ever," by the New York Times and "today's gold standard among countertenors" by the Chicago Tribune. (Dkt. 203-17, PageId.6183).

Lipian had graduated from Oberlin College in Ohio in May 2012 with a Bachelor of Arts in philosophy. (Deposition of Andrew Lipian, Dkt. 230-17; pg. 35-36, PageId.5862). Lipian attended the Oberlin Conservatory as a countertenor—indeed the first countertenor ever admitted to the Oberlin conservatory—but due to military and familial obligations, he opted not to finish his vocal major. (*Id.*). He worked in the "nonprofit theater industry" between his Oberlin graduation and his 2015 University of Michigan matriculation. (*Id* at 37; PageId.5863).

After their October 2012 master class, Daniels and Lipian stayed in touch. (Lipian 44; PageId.5864). On January 29, 2015, Lipian wrote a message to Daniels congratulating him on his appointment to U of M and telling him that he would make

---

[1] A countertenor is the male equivalent of a mezzo-soprano. It encompasses a unique vocal range that traces its lineage back to the falsettos in seventeenth century sacred choirs.

a "brilliant professor." (Lipian 97; PageId.5878). Lipian also promised that "The minute you get to Ann Arbor, I will come bearing scotch." (Lipian 98; PageId.5878).

Lipian applied to SMTD, because it was close to his home in Ohio and also a very good music school. (Lipian 99-100; PageId.5878). He also applied, because Daniels was "regarded as the Luciano Pavarotti of countertenors" and "his presence in the University was a draw for young singers, because he is a very big name in the opera industry." (Lipian 55; PageId.5867).

Lipian was initially denied admittance to SMTD, because he had to first complete the undergraduate requirements for his vocal degree, which he began, but did not finish, at Oberlin. U of M eventually determined that Lipian could enroll as an undergraduate for a year and then join the SMTD as a graduate student. (Lipian 100-101). During his audition, at which Daniels was present, Lipian stayed overnight with Daniels and his husband. (Lipian 50). On April 28, 2016, Lipian wrote to Daniels that he was eager to work with him, and they discussed registration for Daniels's voice lesson. (Dkt. 203-13; PageId.6039-6043).

Addressing that many of text messages between him and Daniels could fairly be read as friendly or even sexual banter, Lipian has emphasized that he had no choice but to go along with Daniels's banter, lest his reputation be tarnished and his career sabotaged. He feared that because the world of classical vocalists was so small and personal, Daniels could easily retaliate against him by blackballing him. When

asked, for instance, about his July 29, 2015 text message looking forward to more "purple thong sessions" with Daniels, Lipian explained that he had no choice but to play along with, and even escalate, Daniels's jokes.

> I didn't want to anger him by not responding in kind using the same terminology he would use. Even then I recognize his power in the industry. So I played along. (Lipian 95-96; PageId.5877).

Lipian joined the SMTD graduate program in fall of 2016, intending to become a professional countertenor. (TAC ¶ 17). In addition to attending Daniels's class, Plaintiff took private lessons with Daniels once per week. (TAC ¶ 24). Daniels held himself as a mentor and promised career assistance and professional connections. (TAC ¶ 28).

**The Individual Defendants**

Plaintiff names 11 defendants in his Third Amended Complaint. The first is the University of Michigan. (TAC ¶ 3). The other ten are University employees and Plaintiff's allegations of their roles at U of M are as follows. Jeffrey Frumkin was the Associate Vice Provost of Faculty and Academic Affairs and Interim Senior Director of the Office of Institutional Equity ("OIE"). (TAC ¶¶ 4, 70). Elizabeth Seney was an OIE investigator. (TAC ¶¶ 5, 65). Pamela Heatlie was the Title IX Director. (TAC ¶¶ 6). Martha Pollack is alleged only to have been an individual employed by U of M from May 2013 through September 2017. (TAC ¶ 9). Stephen West was the Chair of the Voice Department at SMTD. (TAC ¶ 10). Melody Racine,

Aaron Dworkin, and Christopher Kendall were all deans or interim deans of the School of Music, Theater & Dance. (TAC ¶¶ 7, 11, 13). Martin Philbert was the Provost of the University of Michigan (TAC ¶ 8). Mark Schlissel is the President of the University of Michigan. (TAC ¶ 12).

**Defendants' Knowledge of Daniels's Behavior**

Plaintiff's Third Amended Complaint provides some detail regarding Daniels's reputation at U of M. One faculty member told West before Daniels's hire, "they're hiring David Daniels, and someone needs to be sure that he's not going to be engaging with young students." (¶ 35; Deposition of Matthew Thompson, Dkt. 230-23, pg. 64; PageId.8740). Though West reportedly asked whether he or Racine should speak to Daniels, Racine denied any knowledge of this exchange. (Deposition of Melody Racine, Dkt. 203-20, pg. 206). The TAC also alleges that it was common knowledge at SMTD that Daniels was outwardly sexual and that many members of the voice department had concerns about Daniels being sexually forward at the SMTD. (TAC ¶¶ 31-32).

These allegations are partially borne out by the record. Eugene Rogers, ombudsperson and Director of Choirs, knew Daniels from when he and Daniels husband, Scott Walters, were both graduate school students at U of M, in 2011. (Deposition of Eugene Rogers; Dkt. 230-21, pg. 5; PageId.8530). Rogers testified that he was aware of rumors that Daniels was "very outwardly sexual." (Rogers 16;

PageId.8532). Lipian testifies that the classical vocalist world was small, that Daniels was a well-known philanderer, and that there is no way that the other SMTD professors, who were also in this world, did not know about his "proclivities." (Lipian 137-138; PageId.5888). Dean of SMTD Melanie Racine testified, "I don't recall anyone coming to me saying – he told me "[Daniels] was sexually explicit." (Racine 172; PageId.5973). Upon being asked how it could be that 20 students had firsthand knowledge of Daniels's sexually inappropriate communications, but nobody in the faculty or administration had knowledge of Daniels's sexual inappropriateness, Racine answered that in order for the faculty to know something was wrong, the students would have to tell them. (Racine 185-186; PageId.5975).

During the course of his time at SMTD, Lipian took studio lessons with Daniels, who was the only countertenor instructor. Racine described studio work as an hour lesson per week with an instructor and then a studio class where the students all meet, sing in front of each other, and critique each other's singing in front of the professor. (Racine 117, PageId.5970). Students typically stay with the same voice instructor for the whole two-year program, but if they wish to change, the SMTD makes that available. (Racine 122, PageId.5971). Daniels was the only countertenor instructor at U of M. (*Id.*). Lipian testified that he would have liked to branch out and maybe take tenor lessons with another instructor, but he was turned down, and

he believes he was turned down, because the other professor did not want to anger Daniels. (Lipian 124).

**The Sexual Assault and Harassment**

Plaintiff pleads that on March 24, 2017, Daniels invited Plaintiff to his apartment to watch Ru Paul's Drag Race, a popular drag-queen reality show. (TAC ¶ 74). Daniels said that he was lonely and wanted to discuss Plaintiff's career. Plaintiff drank several glasses of bourbon and then announced that he needed help sleeping for a performance the next day. Daniels gave him Ambien (a sleep medication) but told him that it was Tylenol PM. "Daniels then removed Plaintiff's clothes, forced himself upon Plaintiff and groped and touched his genitals and face." (TAC ¶ 75). Shortly thereafter, Daniels told Plaintiff that he would be receiving a full fellowship for his two-year graduate program. (TAC ¶ 76)

Lipian testified that Daniels invited Lipian over to discuss his career, but that Daniels just wanted to watch TV. (Lipian 141). He testified that Daniels and he were alone, listening to recordings of tenors and talking about music. Lipian testified that when it was getting late, he attempted to take his leave, but then Daniels gave him an Ambien that he said was a Tylenol PM to help him sleep. (Lipian 144-146; PageId.5890). Next thing Lipian remembers, he was being dragged upstairs and sexually assaulted. (*Id.*). Text messages from between Lipian and Daniels suggest

the night in question may have been March 22, 2017, not March 24, 2017. (Dkt. 203-13, pg. 62-67; PageId.6101; 6096-6098).

The Third Amended Complaint alleges the following forms of sexual harassment from the beginning of his studies in 2016 until August 2018: Daniels's requests for pictures from Plaintiff of his genitalia, requests of video of Plaintiff masturbating, pictures of genitalia and sex toys, video of Daniels masturbating, and statements regarding other students' bodies, Daniels's preferences, and wishes that Plaintiff were gay. (TAC ¶ 77). Plaintiff never shared graphic photos or texts with Daniels, but only attempted to "keep him at bay." (TAC ¶ 78).

The record is replete with text messages and testimony evidencing Daniels's sexual pursuit of Lipian during the course of Lipian's studies. (See, e.g., Dkt. 203-13; PageId.6053). There are also messages in which Lipian appears to invite further engagement from Daniels. When asked about messages that read "I love you" or "Thanks for spending some time with me. Night DD. Heart." (Lipian 183), Lipian responded with the following explanation:

> Look, I was trying to prevent him from retaliating against me. He already assaulted me. I did not want him to do more damage to my career by withholding opportunities I had earned through my good conduct and my great grades, and that would damage my family economically, and he had already damaged me physically. I did not want to experience economic damage through career blackballing or any other methods of retaliation I knew he was able to exercise." (*Id.*).

Lipian gave several examples of times when he understood that Daniels had blackballed other students whom he disfavored. (Lipian 186-187). This is why, Lipian asserts, he wrote a glowing letter in support of Daniels's tenor review. (Lipian 188).

**U of M's Response to Complaints about Daniels**

The Third Amended Complaint alleges that in March of 2018, an anonymous complaint was made to the Office of Institutional Equity ("OIE") that Daniels was propositioning students on Grindr (an LBGTQ dating app) and offering them money for sex. (TAC ¶ 64). OIE investigator Elizabeth Seney interviewed Daniels, who denied the account, and took no further action. (TAC ¶¶ 64-67).

Seney described in her deposition receiving an anonymous complaint from a student alleging that he had been propositioned for sex on Grindr by Daniels. She said that she discussed the allegations with Pamela Heatlie, her supervisor, and that they decided to "reach out to" all of the first-year vocal performance students. (Deposition of Elizabeth Seney, Dkt. 203-8, pg. 190-192; PageId.5996). Three students responded; of those three, interviews were arranged with two. Neither of the two expressed any concerns, and at that point Seney and Heatlie determined that they "had been unable to gather any additional information to identify a possible complainant or learn of any other concerns or information related to the concerns at all." (Seney 192; PageId.5996).

On April 2, 2018, Seney sent an email to "oie-investigators" asking the following.

> Is anyone familiar with an allegation of a faculty member making sexual advances towards a graduate student, or offering an undergraduate student financial compensation for sexual activity?
> Secondly, has anyone received any reports regarding SMTD faculty member David Daniels? (Dkt. 203-30; PageId.6291).

She then set up a meeting with Daniels to explain their concerns and emphasize the university's sexual harassment policy.

> [I] also explained to him that the allegations were extremely concerning and, if true, would likely violate the university's policy. We talked about the sexual harassment policy. We also talked about the policy pertaining to relationships between faculty and students. (Seney 193).

OIE did not report the incident to law enforcement until July 16, 2018. (Dkt. 203-33; PageId.6295).

Lipian testified that he saw how the Grindr complaint didn't result in any actual discipline, and "had a good reason to infer, therefore, that they would take no reasonable action in my case." (Lipian 190). On April 8, 2018, Lipian told Professor Matthew Thompson, a faculty member and former student of SMTD, "David [Daniels] gets inappropriate in lessons, and it can be harassing." (Lipian Dep. 130; PageId.5886). When pressed for details, Lipian expressed his fear that he would be blackballed if word got back to Daniels, so he asked to speak in confidence and told him that Daniels made him feel "uncomfortable." (Lipian 131). Thompson reportedly told Lipian that he was also sexually harassed while a student at U of M,

and that Dean Racine refused to help him. (Lipian 133). Thompson reportedly told Lipian, "they don't care…the whole school of music is like this." (*Id*.). Thompson reportedly said, "there is a very low probability that anyone will take it seriously." (*Id*.). (Lipian 135; PageId.5887). Thompson also testified that the importance of networking in the vocal performance industry makes reporting sexual harassment very difficult. (Thompson 89-91),

On May 17, 2018, upon recommendation of the Dean of SMTD, Daniels was granted tenure by the U of M Board of Regents. (TAC ¶ 39; Dkt. 203-25; PageId.6270). Among the student and faculty letters in support of his tenure was one from Lipian, dated September 6, 2017, praising Daniels for "his respect and nurturing of students in diverse areas of their lives." (Dkt. 203-20; PageId.6210).

On July 14, 2018, someone posted on the U of M Opera Facebook page, "David Daniels is a serial rapist who drugs and rapes boys with his husband…" (TAC ¶ 91). On July 16, 2018, "an unnamed person" sent an email to the U of M Regents, the SMTD, and Executive Officers, accusing Daniels and his husband of raping a young singer in 2010. (TAC ¶ 91; Dkt. 230-10). It further alleged that since then dozens of young men have been harassed by Daniels, including receiving pictures of his genitals. (*Id*.). Daniels and Lipian discussed the allegations by text message the next day, with Daniels telling Lipian "he knows better than post our names. Because we'll destroy him." (Dkt. 203-13; PageId.6034).

On July 18, 2018, the U of M Police Department interviewed Daniels regarding rape allegations by a student in Houston against Daniels and his husband. (TAC ¶ 94). Daniels and his husband were indicted by a Texas grand jury in Houston on July 25, 2018 for second degree criminal assault. (TAC ¶ 100).

On August 18, 2018, Lipian and Daniels planned to meet up the following week. (Dkt. 203-13; PageId.6038). Its unclear if they did. On August 22, 2018, Lipian texted Daniels, "I heard. My thoughts and love are with you and Scott right now." (*Id.*). He elaborated "it's gonna be ok. We'll fight this sob," and then, "With your permission. I'd like to take the lead and post a studio email in support of you and Scott." Daniels responded, "No." (*Id.*).

On August 22, 2018, Racine sent emails to SMTD students and faculty explaining the allegations against Daniels and urging any individuals "with concerns about this matter" to contact the OIE. (Dkt. 203-36; PageId.6303-6304). On August 23, 2018, upon being told of Lipian's assault, Thompson reported the incident to the OIE. Plaintiff alleges that the OIE did nothing until six days after this lawsuit was filed, at which point they asked him about his "concerns regarding sexual misconduct by a faculty member." (TAC ¶ 166).

On August 24, 2018, Racine emailed Daniels confirming that "there should be no communication between you and your students at this time." (Dkt. 203-37; PageId.6306). Pamela Heatlie, U of M's Title IX Coordinator at the OIE, testified

that when she received the reports of Daniels's conduct, there was a law enforcement hold in place. (Pamela Heatlie Dep. 200; PageId.5946). Heatlie testified that she does not remember who specifically told her to put the case on hold, but only remembers that there was a hold. (Heatlie 201; PageId.5947). Detective Margie Pillsbury, an officer of the U of M Police Department, testified that she frequently asks OIE to hold off on their investigation until law enforcement can complete their investigation, as "once [OIE] put[s] a person who is being accused on notice, that person no longer wants to cooperate with law enforcement." (Deposition of Margie Pillsbury, Dkt. 203-5, pg. 27; PageId.5950). Indeed, Seney's July 16, 2018 email to Pillsbury ends with the sentence, "As we discussed, I will wait to hear from you before taking any action with respect to the new allegations that have since been reported." (Dkt. 203-33; PageId.6295). On August 22, 2018, Seney wrote to Pillsbury asking about "OIE needing to hold on our process with respect to the allegations involving David Daniels." She finished her email, "As always, we certainly don't want to interfere with any investigation, but I just wanted to check in as to the status." (Dkt. 203-35; PageId.6302). Seney acknowledged that other agencies were involved, and Pillsbury responded that she would update Seney when the other agencies updated her. (Dkt. 203-35; PageId.6301).

Pillsbury testified that she and Seney discussed contacting Lipian in order to determine where his crime occurred, so that she could refer him to the proper law

enforcement agency. (Pillsbury 65; PageId.5954). Pillsbury emailed with Lipian and Lipian's former attorney between August 28 and September 21, 2018. (Dkt. 203-13; PageId.6308-6320). She testified that she asked OIE to "hold off on this, because I was under the impression from the report that was made and then from talking to Mr. Lipian by phone or email and his attorney that he was interested in filing a criminal report…So I clearly remember asking OIE to not proceed with their investigation." (Pillsbury 166; PageId.5958). Pillsbury then testified that she closed the matter around October 11 "or thereabouts," when she realized that Lipian was not going to move forward with filing a police report. (Pillsbury 167). Seney sent Pillsbury an email on October 23, 2018 asking about the status of the investigation and if she could proceed with the OIE investigation. Pillsbury told her to go ahead. (Dkt. 203-42).

### The OIE Report and Investigation

Seney contacted Lipian on October 30, 2018, six days after this lawsuit was filed. (Dkt. 203-43). On November 13, Plaintiff's counsel emailed Seney and told her that Lipian would not meet with her, but that Lipian will "answer written questions." (Dkt. 203-46). Seney did send emails to Plaintiff and his counsel asking for his side of the story, but she did not send specific questions to Plaintiff. On January 31, 2019, Plaintiff's counsel sent Seney an email asking what text messages Daniels shared with OIE and asking for a summary of OIE's interview with Daniels.

She also asked, "why have you not sent written questions as we previously offered?" (Dkt. 223-21).

On March 26, 2019, the University completed their investigation into Daniels's sexual harassment of the student body at large and found that Daniels had engaged in multiple violations of the University's sexual harassment policies from 2016 to 2018. (Dkt. 230-2). The Report, UM-Daniels, found that over twenty individuals had first-hand knowledge of Daniels's sexual harassment. (*Id.*).

The second report, Lipian-Daniels, focused exclusively on Daniels's relationship with Lipian, and was issued on September 3, 2019. The report noted that the OIE investigation began on October 24, 2018, after UMPD advised the OIE that they could proceed. (Dkt. 230-3; PageId.7560). The OIE Report concluded that Daniels violated the University's rule on Faculty-Student relationships, SPG 601.22. (*Id.* at 44-46). As to the University's Sexual Harassment policy, SPG 201.89, the Report concluded that there was not enough evidence to understand what occurred in March of 2017 and "whether or not they mutually welcomed whatever conduct may have transpired." (*Id.* at 43).

On March 26, 2020, the Board of Regents of the University of Michigan voted to terminate Daniels's tenure and dismiss him from the University. *See* Steve Marowski, *UM fires David Daniels, tenured opera professor accused of sexual misconduct*, MLIVE (Mar. 26, 2020) https://www.mlive.com/news/ann-

arbor/2020/03/um-regents-vote-to-fire-david-daniels-tenured-opera-professor-accused-of-sexual-misconduct.html; Michael Levenson, *Opera Star, Charged With Sexual Assault, Is Fired by University of Michigan,* THE NEW YORK TIMES (Mar. 26, 2020) https://www.nytimes.com/2020/03/26/us/david-daniels-michigan-opera-singer-fired.html.

## PROCEDURAL BACKGROUND

Plaintiff filed his original complaint on October 24, 2018. [Dkt. #1]. He filed his First Amended Complaint [6] on October 31, 2018. On December 6, 2018, the University filed its Motion to Dismiss [15] the Amended Complaint. The Court denied Defendant's Motion to Stay Discovery pending the Motion to Dismiss [21] and held the motion to dismiss in abeyance pending preliminary discovery. (Dkt. # 83). Following a September 24, 2019 hearing, the Court granted Plaintiff's Motion to file a Third Amended Complaint (skipping the second amended complaint, which was flawed) and denied as moot Defendant's Motion to Dismiss. (Dkt. 152). Limited discovery was extended until November 4, 2019. (*Id*.).

Defendants filed a new Motion to Dismiss [178] on October 25, 2019 and a Motion for Summary Judgment [203] on December 13, 2019. Plaintiff moved to compel discovery [191] and to extend discovery into 2020, but the Court denied these motions. (Dkt. 201). The motions to dismiss and for summary judgment are now fully briefed, and a hearing was held on March 11, 2020. On March 13, 2020,

the parties filed supplemental briefs [244, 245, 246] upon the Court's invitation, and Defendant subsequently moved to strike [247] the exhibits to Plaintiff's first supplemental brief.

## LEGAL STANDARDS

Defendants bring both a motion to dismiss under Rule 12(b)(6) and a motion for summary judgment under Rule 56.

Defendants' motion to dismiss will be granted on counts where Plaintiff fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). On such a motion, the Court must "construe the complaint in a light most favorable" to Plaintiff and "accept all of [its] factual allegations as true." *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). "Although the factual allegations in a complaint need not be detailed, they 'must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief.'" *Id.* (*quoting LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007)). To survive such a motion, Plaintiff must plead factual content that allows the Court to draw a reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged— but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

When evaluating Defendants' motion for summary judgment, by contrast, the Court must consider the evidence on the record, drawing all inferences in Plaintiff's favor. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The question on summary judgment is whether the moving party has demonstrated that the evidence available to the court establishes no genuine issue of material fact such that it is entitled to a judgment as a matter of law." *Dobrowski v. Jay Dee Contractors, Inc.*, 571 F.3d 551, 554 (6th Cir. 2009). The moving party has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party "may not avoid a properly supported motion for summary judgment by simply arguing that it relies solely or in part upon credibility considerations…[but instead] must present affirmative evidence." *Fogerty v. MGM Group Holdings Corp., Inc*., 379 F.3d 348, 353 (6th Cir. 2004) (quoting *Cox v. Ky. Dep't of Transp*., 53 F.3d 146, 150 (6th Cir. 1995)).

**ANALYSIS**

## A. <u>Legal Framework and Introductory Questions</u>

The University of Michigan is a department of the government of the State of Michigan and is thus protected by the Eleventh Amendment. *Estate of Ritter v. University of Michigan*, 851 F.2d 846, 851 (1988). The Eleventh Amendment is not an absolute bar, however. State actors can be sued where Congress has abrogated Eleventh Amendment protections, such as it did for the damages remedy of Title IX. *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 284 (1998) (citing *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 68-73 (1992)). Plaintiffs may also sue state employees in their official capacity seeking prospective equitable relief, under *Ex Parte Young. Thiokol Corp v. Dep't of Treasury, State of Mich., Revenue Div.*, 987 F.2d 376, 381 (6th Cir. 1993).

Plaintiff has graduated SMTD and is no longer enrolled at U of M. He therefore lacks standing to sue for injunctive relief on against the individual defendants regarding University policy. The parties dispute whether he has standing to sue for the expungement of the non-public OIE report, Lipian-Daniels. Plaintiff has argued that the Report is non-public only in form, as it accessible under the Freedom of Information Act, and at least one media outlet likely has the report already.

The fact that the report is already published, not to mention already publicly available, is fatal to Plaintiff's suit for injunctive relief under *Ex Parte Young*. Plaintiff seeks, in effect, retrospective injunctive relief—that the University undo something that had already been completed. *Ex Parte Young* did not contemplate that such relief fell within an exception to the Eleventh Amendment. *Green v. Mansour*, 474 U.S. 64, 68 (1985); *see also McGee v. Feneis*, 2009 WL 2928245 at *5 (D. Minn. Sept. 8, 2009) (holding that the expungement of a state prison violation is a retroactive form of injunctive relief, and does not fall under the *Ex Parte Young* exception). The Eleventh Amendment does not prevent federal courts from enjoining "ongoing violations of federal law," but it does prevent federal courts from adjudicating past violations of federal law. *Mansour*, 474 U.S. at 71. The Court has no jurisdiction over Plaintiff's suit for injunctive relief against university officials in their official capacities.

The individual defendants, as state employees, are also absolutely immune from suits seeking monetary damages brought against them in their official capacities. *Hawthorne-Burdine v. Oakland Univ*., 158 F.Supp.3d 586, 598 (E.D. Mich. 2016). This is because state officials in their official capacities are not "persons" under § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 67 (1989).

That being said, Plaintiff can sue University officials in their individual capacity for damages under 42 U.S.C. § 1983, but two important qualifications apply.

First, respondeat superior liability does not exist under § 1983, and § 1983 liability will attach to a supervisor only where is a "direct causal link" between the supervisor and the acts of subordinates giving rise to liability. *Hays v. Jefferson County*, 668 F.2d 869, 872 (1982). Defendants who were alleged only to have failed in their supervisory roles can be dismissed. This includes at least Mark Schlissel, University of Michigan President, and Martin Philbert, then University of Michigan Provost. Further, the Third Amended Complaint alleges no individual acts or omissions undertaken by Martha Pollack, Aaron Dworkin, and Christopher Kendall. Against Heatlie, the Third Amended Complaint only alleges that she never made an effort to learn whether or not Daniels had received sexual harassment training. (TAC ¶¶ 51-52). Plaintiff has failed to state a claim against Defendants Schlissel, Philbert, Pollack, Dworkin, Kendall, and Heatlie, and they are all properly dismissed under Rule 12(b)(6).

Plaintiff alleges that Frumkin admitted it was an "open secret that Daniels was overtly sexual in the way that he talked to his students." (TAC ¶ 70). His deposition testimony makes clear that Frumkin "became aware of that characterization" only after reviewing witness statements. (Deposition of Jeffrey Frumkin, Dkt. 203-3, pg.

235, PageId.5933). Frumkin testified that he did not work on the Lipian-Daniels matter. Seney worked on this matter for the OIE, and when asked if he supervised Seney, Frumkin responded, "I oversee the operations of the office." (Frumkin 77; PageId.8030). Under a Rule 56 standard, Plaintiff demonstrates nothing more than respondeat superior liability on behalf of Frumkin. Defendants' motion for summary judgment will be granted as to Frumkin.

Second, the remaining defendants sued in their individual capacity under § 1983—Seney, Racine, and West—are protected by the doctrine of qualified immunity. Qualified immunity insulates officials from suit under § 1983 for damages arising out of the performance of their official duties if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982). It protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Defendants raised the defense of qualified immunity in both of their motions. Plaintiff in his response to Defendants' motion to dismiss argued that the qualified immunity analysis is premature at the Rule 12(b)(6) stage. (Dkt. 184, pg. 17, PageId.5042). In Plaintiff's response to Defendants' motion for summary judgment, Plaintiff "incorporated by reference" the arguments made in his response to the motion to dismiss. (Dkt. 230, pg. 33, PageId.7410). He also referenced "specific

facts elucidated in this brief and exhibits thereto." (*Id*.). Nowhere in the briefs or the exhibits, however, are cases that purport to show any "clearly established law"—articulated beyond "a high level of generality"—that any of the individual defendants violated. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). On many of the counts, because no reasonable jury could find that any individual defendant violated Plaintiff's constitutional rights, the Court will not even have to reach the question of whether the such rights were clearly established at the time of the alleged violation.

**B. <u>Counts I, IV(a), V, VI(a), & VI: Counts arising from the University's Supervisory Failures</u>[2]**

**Count I: Title IX Sexual Harassment, as against the University**

Section 901(a) of Title IX of the Education Amendments of 1972 provides "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." The University receives Federal financial assistance, and so it can be liable under Title IX, if Plaintiff satisfies the following three elements.

> a) [He] was subjected to quid pro quo sexual harassment or a sexually hostile environment; b) [he] provided actual notice of the situation to an "appropriate person," who was, at a minimum, an official of the Educational entity with authority to take corrective action and to end

---

[2] The Third Amended Complaint contains, perhaps inadvertently, two Count IV's and two Count VI's. For the purposes of this order, the Court will refer to the first Count IV as Count IV(a) and the second as Count IV(b). The same will be done with Count VI.

discrimination; and c) the institution's response to the harassment amounted to "deliberate indifference.

*Klemencic v. Ohio State Univ*., 263 F.3d 504, 510 (6th Cir. 2001) (citing *Gebser*, 524 U.S. at 289-91.

Each of these three elements will be considered in turn.

a) Sexually Hostile or Harassing Educational Environment

Plaintiff's sworn testimony that Daniels sexually assaulted him and pressured him into sexualized situations and conversations is sufficient to create a material dispute of fact as to whether he was subjected to quid pro sexual harassment and a sexually hostile environment. This testimony cannot be disqualified merely because Lipian denied ever being a victim of a sexual assault during unrelated medical appointments. (Dkt. 203-27; PageId.6274; Dkt. 203-28; PageId.6277). First, a reasonable jury might believe that an otherwise honest witness was reluctant to reveal his sexual assault before he was ready, even when queried by medical professionals. Second, even if a jury did not believe that Lipian was sexually assaulted, they still might believe that he was subjected to quid pro sexual harassment or a sexually hostile educational environment.

b) Actual Notice to an Appropriate Person

Defendants argue that the injuries Plaintiff alleges—the March 2017 sexual assault and subsequent harassment—occurred well before anyone at the University, let alone an "appropriate person" within the meaning of Title IX, had "actual notice"

that Plaintiff was at risk. They argue that actual notice was not established until Thompson reported Lipian's statements on August 23, 2018, after Lipian had left the University and Daniels had been arrested and subject to a no-contact order by the University. Plaintiff argues that everyone at the School of Music, Theater & Dance knew from the time of Daniels's hire that he behaved in a sexually aggressive and predatory manner towards young male students. If Plaintiff never reported the March 2017 sexual assault, it was because he was taught to fear reprisals from Daniels and his allies at SMTD and in the vocalist world more broadly.

"Applying the actual notice standard under *Davis* is ultimately a matter of who knew what and when." *Doe v. Hamilton Cty. Bd. of Educ.*, 329 F. Supp. 3d 543, 564 (E.D. Tenn. 2018). The who, what, and when are all contested in this case.

- The Who

Plaintiff can only make out a Title IX suit if the person who received notice was an "appropriate person." "An 'appropriate person' under § 1682 is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." *Gebser*, 524 U.S. at 290. Institutions cannot be liable for imputed knowledge. *Davis v. Monroe County Board of Education*, 526 U.S. 629, 642 (1992). Nor are doctrines of constructive knowledge or respondeat superior available. *Id.* at 285.

Defendant argues that only an employee of the Office of Institutional Equity can qualify as an "appropriate person." Plaintiff argues that the definition is broader, encompassing even the Director of Choirs, along with the Chair of the Vocal Department and the Dean of SMTD.

Because educational institutions allocate authority in different ways, and because faculty hierarchies and disciplinary protocols are often unique and idiosyncratic, there can be no bright-line rule on who is or isn't an appropriate person to receive a Title IX report. *See Plamp v. Mitchell Sch. Dist. No. 17-2*, 565 F.3d 450, 457 (8th Cir. 2009); *see also Murrell v. Sch. Dist. No. 1, Denver, Colo*., 186 F.3d 1238, 1247 (10th Cir. 1999) ("Because officials' roles vary among school districts, deciding who exercises substantial control for the purposes of Title IX liability is necessarily a fact-based inquiry."). High school principals will often be considered appropriate persons, even where they lack the unilateral power to hire or fire a teacher. *Doe v. Sch. Bd. of Broward Cty., Fla.,* 604 F.3d 1248, 1255 (11th Cir. 2010) (a principal was an appropriate person where he could "initiate corrective action" or place "other restrictions" on an offending teacher, even where he did not have the authority to take final adverse employment actions); *Plamp*, 565 F.3d at 457; *Murrell*, 186 F.3d at 1247 ("We find little room for doubt that the highest-ranking administrator at GWHS exercised substantial control of Mr. Doe and the GWHS school environment during school hours"); *Warren ex rel. Good v. Reading Sch.*

*Dist.*, 278 F.3d 163, 170 (3d Cir. 2002) (holding that principal was an appropriate person for Title IX notice); *Doe v. Farmer*, 2009 WL 3768906 (M.D. Tenn. Nov. 9, 2009) ("As long as the official possesses the ability and the duty to take meaningful steps toward stopping the abuse, the official's deliberate indifference should translate into school board liability under Title IX.") (quoting *Baynard v. Malone*, 268 F.3d 228, 239 (4th Cir. 2001) (Michael, J., dissenting in part)). Applying this lesson to the University context, courts should not decline to find notice where a supervisor learns of his or her subordinate's misconduct, merely because that supervisor lacks the technical power to hire, fire, transfer, or formally discipline.

Faculty members who did not supervise Daniels, however, would not be Title IX "appropriate persons" simply by virtue of being mandatory reporters. As one district court explained, "there is a difference between an employee designated to *report* a sexual harassment complaint and an employee designated to *respond* to such a claim." *Kesterson v. Kent State Univ.*, 345 F. Supp. 3d 855, 872 (N.D. Ohio 2018) (on appeal) (holding that a softball coach was not an "appropriate person," because she did not have any authority over students not on the softball team). Courts have found that campus security officers were not appropriate persons for Title IX purposes, because a contrary holding "would entail the sort of vicarious liability that the Supreme Court tried to avoid in *Gebser*." *Ross v. Univ. of Tulsa*, 859 F.3d 1280, 1291 (10th Cir. 2017). The Title IX inquiry focuses on those individuals who are

appointed to monitor the conduct of others and can, "as distinguished from reporting to others, remedy the wrongdoing themselves." *Rosa H. v. San Elizario Indep. Sch. Dist.,* 106 F.3d 648, 660 (5th Cir. 1997).

Plaintiff concedes that Matthew Thompson was not an appropriate person to receive a Title IX report and trigger University liability. The Court further finds that Eugene Rogers also is not "an appropriate person." Whatever his duties were as Director of Choirs, there is no suggestion that he had any sort of supervisory authority over Daniels, and his power to correct Daniels's behavior appears to have been limited to reporting his conduct up the chain of command. (Rogers 8).

Stephen West, however, as the Chair of the Vocal Department, held direct supervisory authority over Daniels. Though West may not have had the authority to discipline Daniels, as the chair of the department in which Daniels taught, he had at least the authority to monitor Daniels's interactions with his students, instruct Daniels on proper student-faculty behavior and boundaries, and involve himself or others in Daniels's one-on-one vocal lessons. *See Plamp*, at 565 F.3d at 458. Indeed, there is an indication that West himself thought that some intervention undertaken by Daniels's supervisors might be necessary. Thompson testified that before Daniels was hired, he apparently told West, "[t]hey're hiring David Daniels, and someone needs to make sure he's not going to be, you know, engaging with young students."

(Thompson 64; PageId.8740). West then reportedly asked Thompson whose responsibility that should be, his or the Dean's? (*Id.*).

Notice of Daniels's behavior to Steven West, in addition to notice to OIE representatives, will therefore constitute "actual notice" under Title IX.

- The What

The Sixth Circuit has not squarely answered the question of whether notice of harassment of other, non-plaintiff, students meets the the actual notice requirement of a plaintiff who did not provide notice. Defendants argue that rumors about Daniels's harassment of other students does not meet the actual notice standard. They rely on *Henderson v. Walled Lake Consol. Sch.* 469 F.3d 479 (6th Cir. 2006) to argue that notice regarding one student's harassment cannot translate to notice regarding widespread harassment. *Id.* at 490-91 ("Indeed, even if the game-time flirting between [the coach] and [a student] ought to have triggered further inquiry by [the assistant principal], it can hardly support a reasonable finding that [the assistant principal] and other school officials should therefore have known that *another* team member, [the plaintiff], was the victim of a hostile environment."). What *Henderson* dismissed, in dicta, as "game-time flirting" is very different from the acts of sexual aggression and attempted solicitation alleged against Daniels.

District courts in this circuit have tended to find that past acts of harassment "may provide a school notice if the conduct demonstrates a pattern of and propensity

for sexual harassment, even if prior harassing was not directed towards the plaintiff specifically." *Doe v. Hamilton County Board of Education*, 329 F.Supp.3d 543, 565 (E.D. Tenn. 2018); *see also Johnson v. Galen Health Institutes*, Inc., 267 F. Supp. 2d 679, 688 (W.D. Ky. 2003) ("Consistent with the majority of other courts, the Court thus finds that the actual notice standard is met when an appropriate official has actual knowledge of a substantial risk of abuse to students based on prior complaints by other students."); *see also Thorpe v. Breathitt County Bd. Of Educ.*, 8 F.Supp. 932, 944-45 (E.D.K.Y. 2014) (finding actual notice when the parents of the plaintiff's classmates complained about a teacher's sexual harassment).

Out-of-circuit courts have held that a group sexual assault of other students at a football camp allowed the plaintiff to establish actual notice, even where the coaches did not have any notice of his specific assault. *Roe ex Rel. Callahan v. Gustine Unified School District*, 678 F.Supp.2d 1008, 1030 (E.D. Cal. 2009) ("Defendant's argument that the prior sexual assault and/or conduct must be "plaintiff specific" is unsupported by current case law") (collecting cases). The Eleventh Circuit has also found that past sexual misconduct against other students is relevant to the actual notice analysis. *Williams v. Board of Regents of University System of Georgia*, 477 F.3d 1282, 1292 (11th Cir. 2007). The Tenth Circuit went further, and, interpreting *Gebser*, held that "[b]y noting that actual knowledge of discrimination in *the recipient's program* is sufficient, the [Supreme] Court

implicitly decided that harassment of persons other than the plaintiff may provide the school with the requisite notice to impose liability under Title IX." *Escue v. N. OK Coll.*, 450 F.3d 1146, 1153 (10th Cir. 2006).[3]

The weight of the case law supports the conclusion that once on notice that a faculty member has sexually harassed others, the school is on notice that he may harass more students.

That does not mean, however, that notice of a general sexual proclivity towards younger men, or a general lack of boundaries, can establish notice of a hostile educational environment. The Court is sympathetic to Defendants' argument that Title IX should not construed to require universities to find notice of sexual harassment where LGBTQ faculty are open and ostentatious with their sexuality. Taken in the light most favorable to Plaintiff, the evidence suggests that Daniels's behavior went beyond flamboyance, however.

First, whatever his sources were, West appears to have had actual knowledge at the time of his hire that Daniels was inclined to pursue sexual encounters with his students, in violation of the U of M Standard Practice Guides ("SPG"). Thompson testified that both he and another faculty member commented at the meeting about

---

[3] A Seventh Circuit panel recently ruled that repeated warnings of a teacher's flirtatious and sexual behavior did not provide actual knowledge. The Seventh Circuit vacated the decision last October and is preparing to issue a ruling *en banc*. *Doe No. 55 v. Madison Metropolitan School Dist*, No. 17-1251, 897 F.3d 819 (7th Cir. 2018) (vacated Oct. 11, 2018).

Daniels's hire that "[s]omeone's got to tell him to keep his hands off the SMTD students." (Thompson 64; PageId.8740). West does not mention this meeting in his witness statement to the OIE, and he told the OIE that he was primarily concerned with Daniels's drinking. (Dkt. 233-2; PageId.8808). There are therefore questions of material fact as to what West knew about Daniels at the time of his hire.

Second, the OIE appears to have had actual knowledge in March 2018 that Daniels may have been offering to pay students for sex, in violation of both the University's SPG and the Michigan Penal Code.

- The When

The first instance of the University's notice—demonstrated through Thompson's and West's conversation at the time of Daniels's hire—predates the sexual assault and Plaintiff's entire tenure at SMTD, so the temporal requirement is easily met. The second instance—the OIE investigation into the anonymous Grindr complaint—occurred in March of 2018. Plaintiff alleges that he was harassed by Daniels throughout the course of their relationship. The OIE Report Lipian-Daniels cites to telephonic communication between Lipian and Daniels as late as October 2018. (Dkt. 230-3, pg. 38-40). Lipian has testified that Daniels created a sexually hostile educational environment for him at SMTD (*see, e.g.,* Lipian 117, 123), and Defendants have not produced evidence that his educational environment ceased to

be sexually hostile before March 2018. Whether Daniels harassed Lipian after the Grindr report is therefore a material question of fact.

Plaintiff has attached some of text messages from the spring and summer of 2018 as an exhibit to its Supplemental Brief [245], along with a "chart" of notice to U of M personnel. The Chart [245-1] is duplicative of information and arguments found in Plaintiff's responses to the motions to dismiss and for summary judgment. The text messages [245-2] reference a factually underdeveloped period of time— Spring 2018—which the Court can determine without referencing the text messages is best explored by a jury. There is therefore no need to adjudicate Defendants' Motion to Strike [247] those exhibits, as both exhibits can safely be disregarded.

The next question becomes whether the University's response to the March 2018 anonymous Grindr complaint was adequate. If it were not, the Court must ask whether its inadequacy caused Plaintiff to be subject to further harassment.

c) Deliberate Indifference

The deliberate indifference standard set forth in *Davis* sets a high bar for plaintiffs to recover under Title IX. *Stiles ex rel. D.S. v. Grainger Cty., Tenn.,* 819 F.3d 834, 848 (6th Cir. 2016). A University can only be deliberately indifferent once it has actual notice that students are threatened. After that point, the analysis shifts to the reasonableness of the University's response. "If the school district takes timely measures to end a substantial risk of abuse, it is not deliberately indifferent [if] such

measures are not clearly unreasonable." *Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 364 (6th Cir. 2005); *see also Davis Next Friend LaShonda D. v. Monroe County Bd. Of Educ.*, 526 U.S. 629 (1999) (holding the same, in the context of peer-to-peer harassment).

A "prompt and thorough response by school officials" is reasonable. *Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir. 1999) (declining to hold a school liable where following a rape complaint they immediately contacted the authorities, investigated the incidents, installed in windows in the doors of the classrooms, placed an aid in the plaintiff's classroom, offered plaintiff escorts, and created counseling sessions). By contrast, a school responds unreasonably where they use the same ineffective methods to no avail. *Vance v. Spencer County Public School Dist.*, 231 F.3d 253, 262 (6th Cir. 2000) ("Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances."). Reprimand letters and "talking" to harassers constitutes deliberate indifference where it does not stop the harassment. *Id.*

That being said, Plaintiff has no right to his preferred remedy. *Kollaritsch v. Michigan State Univ. Bd. of Trustees*, 944 F.3d 613, 627 (6th Cir. 2019). Universities enjoy broad discretion to handle sexual harassment as they see fit, and courts must be a mindful that universities that respond too heavy-handedly to sexual harassment

complaints can find themselves liable for violating the due process rights of the accused. *Id.* (citing *Davis*, 526 U.S. 682 (Kennedy, J., dissenting)). Even lengthy delays, for no good reason, will not violate Title IX if harassment did not continue, because of the delay in disciplinary measures. *Karasek v. Regents of the Univ. of California*, 948 F.3d 1150, 1166 (9th Cir. 2020) (holding that an undergraduate student did not have a cause of action where the university delayed disciplinary proceedings for over eight months); *but see Williams v. Board of Regents of University System of Georgia*, 477 F.3d 1282 (11th Cir. 2007) (a University did not act reasonably when it waited eleven months before taking corrective action, effectively forcing the plaintiff to withdraw); *Doe v. East Haven Board of Education*, 200 Fed.App'x 46 (2d Cir. 2006) (where a high school student was subjected to harassment after a rape and the school delayed remedial action for five weeks).

"An institution cannot avoid Title IX liability if some of its responses were adequate but others were clearly unreasonable." *Foster v. Bd. of Regents of Univ. of Michigan,* No. 19-1314, 2020 WL 1160907, at *17 (6th Cir. Mar. 11, 2020). Though the University's response was reasonable after Daniels was indicted in July of 2018, the evidence suggests that it may have mishandled earlier indications that Daniels was a danger to its students. Thompson testified that he had discussed Daniels's probable interest in SMTD students with West before Daniels was hired, and that West had responded to his concerns by asking who should talk to Daniels about these

concerns. The record suggests that nobody took action to advise Daniels on appropriate standards for faculty-student relationships. Daniels was given a copy of the Standard Policy Guide on sexual harassment and faculty-student relationships, but there is a fact question as to whether he was given any sort of sexual harassment training. (Deposition of Pamela Heatlie, Dkt. 230-16, pg. 56). It was unreasonable for the University to hire a notorious philanderer from a largely unregulated performance industry to a University position that would give him considerable power over younger students, without so much as warning him that abusing such power would have consequences. Daniels's hire to a tenure-track position should have been especially worrisome given the powerful structural incentives for SMTD students, and even faculty, to turn a blind eye towards sexual harassment.[4]

The OIE's response to the March 2018 anonymous allegations against Daniels were also unreasonable. Seney testified that after receive an anonymous report from a first-year SMTD student that Daniels had solicited sex for money via Grindr, she emailed all the first year students who she suspected might have been the complainant, and when none of them responded with concerns about Daniels, she decided not to pursue the case. (Seney 192; PageId.5996). The lack of interest in her email query should not have been surprising, given that the complainant clearly

---

[4] Daniels received tenure on May 17, 2018, was placed on administrative leave three months later, and was stripped of his tenure on March 26, 2020.

wished to report anonymously. So, instead of pursuing investigation into Daniels's online or offline conduct, or reporting the conduct to local law enforcement, Seney met with Daniels and had a cordial conversation. (*Id*.). It is not clear if she even asked him directly about the allegations. The OIE's remedial response appears to be limited to giving Daniels a warning, at best. The Sixth Circuit has held that directives to sexual harassers to cease their harassment, absent some actual enforcement efforts, constitutes deliberate indifference on the part of the University. *Foster*, 2020 WL 1160907, at *15-17.

The OIE cannot reasonably provide mechanisms for anonymous reports and then refuse to pursue or credit anonymous leads when no complainant comes forward and identifies themselves. Nor can the OIE reasonably expect students to publicly come forward given the University's problems with anonymity.

Thompson testified that he was furious to find that after he relayed Lipian's complaint to the OIE, he soon found himself on a litigation hold group email with Daniels—one of the tenured professors that would ultimately review his employment contract. (Thompson 33-35; PageId.8733). Thomson testified that he feared retaliation by Daniels's well-connected industry friends for speaking out against Daniels. Since faculty members vote privately and give no reasons for their vote, there is very little one can do to prove retaliation. (Thompson 24; PageId.8730). Lipian also testified that students feared reporting professors, because in a small

cliquey program like the vocal department of SMTD, complainants may reasonably fear that their complaints would not remain anonymous for long. (Lipian 114-116, Dkt. 230-17, pg. 31). Had the OIE been more critical and conducted even a tenth of the investigation it conducted later that year, it would have likely uncovered evidence of Daniels's pervasive misconduct. Instead, the investigation was closed, or never opened, and Daniels continued in his old ways unencumbered.

Taken in the light most favorable to Plaintiff, there is every indication that West had the actual power, if not the technical authority, to at least mitigate the effects of Daniels's behavior. There is a material question of fact as to whether his or Racine's failure to correct Daniel's behavior was causally related to the harassment Lipian later suffered at Daniels's hands. There is also a material question of fact as to whether Daniels's harassment of Lipian after March 2018 continued because the OIE failed to properly investigate the anonymous complaint against him.

**Count V & Count VI(b): 42 U.S.C. § 1983—Fourteenth Amendment Equal Protection & Fourteenth Amendment Substantive Due Process — Failure to Screen, Train, or Supervise against Defendants Frumkin, Seney, Heatlie, Racine, Dworkin, Kendall, West and Schissel.**

A failure to train, screen or supervise is a mechanism for Plaintiff's to establish liability on the part of a municipal employer. *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *City of Canton v. Harris,* 489 U.S. 378, 387 (1989)). Plaintiff has cited to no case in which individuals were liable for failure to train under § 1983. Indeed, "a supervisory

official's failure to supervise, control or train the offending individual is not actionable." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). Supervising of superior officials will only be liable for their subordinate's actions if they "either encouraged the specific incident of misconduct or in some other way directly participated in it." *Hays v. Jefferson Cty., Ky.,* 668 F.2d 869, 874 (6th Cir. 1982).

Plaintiff pleads no such conduct. Indeed, Plaintiff has not alleged any specific allegations against individual defendants. Faced with this argument in Defendants' motion to dismiss, Plaintiff responded that all of the named individuals "abdicated their responsibilities to screen, train or supervise Daniels." (Dkt. 184, pg. 22, PageId.5047).

In support of this statement, Plaintiff cites to three sections of the Third Amended Complaint. The first is the part where all the individual defendants, and their titles, are introduced. (TAC ¶¶ 4-13). The second is where Count V is pled, which does not name a single defendant by name beneath the heading. (TAC ¶¶ 213-224). The third portion cited was the pleading of Count VI(b), in which the same claims are repeated**,** but as a substantive due process claim, also without naming a single defendant beneath the heading. (TAC ¶¶ 238-251).

These pleadings, which allege that defendants have the "ultimate responsibility" to train and supervise Daniels, attempt to plead a corporate liability on the part of individual defendants. Plaintiff never pleads that any individual

defendant was tasked with training, screening, or supervising Daniels. Collective failures of responsibility are not actionable under § 1983, which requires plaintiffs to plead that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Plaintiff does not plead this, and so both Counts I and VI will be dismissed under Rule 12(b)(6).

### Count IV(a): 42 U.S.C. § 1983: Fourteenth Amendment Equal Protection—Gender, as against Frumkin, Seney, Heatlie, Racine, Dworkin, and Kendall

This count alleges that the individual defendants, under color of law, deprived Plaintiff of his right to equal protection under the Fourteenth Amendment. Specifically, Plaintiff argues that as a male, he was a member of a protected class and was treated differently and less favorably than other similarly situated persons, without rational basis. He also alleges supervisory liability on behalf of Daniels's supervisors for his sexual harassment against Lipian.

The charges of supervisory liability are legally infirm, because, as discussed above, supervisors can only be liable under § 1983 if they encouraged or participated in the illegal conduct. *Hays,* 668 F.2d at 874. Just as the individual defendants could not be liable under Counts V and VI(b) for being negligent supervisors, they also can't be liable under this Count for failing to detect and stop sexual harassment. Plaintiff relies *Bohen v. City of E. Chicago, Ind.*, 799 F.2d 1180 (7th Cir. 1986) as

an example of individual and municipal defendants being liable for sexual harassment. It is critical, however, that the individual defendants in that case were only liable because they were "engaged in by supervisory personnel in the course of their supervisory duties." (*Id.* at 1189). The *Bohen* court found that the City of East Chicago, not the supervisors, were liable for harassment caused due to a custom or policy of allowing harassment. *Id.* The supervisors were liable for harassing the plaintiff. *Id.* The City was liable by way of *Monell*. Because only the individual defendants are susceptible to suit under this count, and because the individual defendants are not alleged to have harassed Plaintiff, the supervisory liability portion of this count fails as a matter of law and can be dismissed under Rule 12(b)(6).

The second half of Plaintiff's equal protection claim is that he was treated poorly by the OIE because he was a male.

"In order to state a claim for an equal protection violation based upon gender discrimination, Plaintiff must demonstrate that he was treated differently—under the same facts and circumstances—than a member of the opposite gender." *Doe v. Ohio State Univ*., 239 F.Supp.3d 1048, 1082-83 (S.D. Ohio 2017) (citing *Kun v. Washtenaw Cty*., 709 F.3d 612, 624 (6th Cir. 2013)). It is an "absolute requirement" for Plaintiff to provide evidence "that a similarly situated person outside [his] category" was treated differently. *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000).

Plaintiff pled that the University's sexual harassment responses were geared towards protecting women, not protecting men. (TAC ¶¶ 115-123). Aside from referencing the University's rhetorical focus on feminism as a basis for combating sexual harassment, Plaintiff does not provide any comparators, i.e., similarly situated women who were the victims of sexual assault and were treated better by the University. Such a claim, however, requires that Plaintiff provide evidence 'that a similarly situated person outside [his] category' was treated differently 'under the same set of operative facts." *Doe v. Ohio State Univ*., 239 F.Supp. 3d 1048, 1082-83 (S.D. Ohio 2017) (quoting *Gardenhire*, 205 F.3d at 319).

The Third Amended Complaint contains several conclusory allegations that Plaintiff was treated worse than similarly situated females. (TAC ¶¶ 112, 189, 204). Without some factual basis, however, those allegations are groundless. Plaintiff claims that it needs discovery on other sexual harassment complaints to support this claim (Dkt. 184, pg. 30; PageId.5055), but the mere suspicion that female complainants were treated better will not be sufficient to open the doors of discovery on dozens of unrelated sexual harassment investigations. *Iqbal*, 556 U.S. at 677 (requiring plaintiffs to prove "sufficient factual matter" to show that defendants undertook actions with discriminatory motives).

Count IV(a) will be dismissed under Rule 12(b)(6).

**Count VI(a): 42 U.S.C. § 1983: Fourteenth Amendment Substantive Due Process — Deprivation of right to personal security and bodily integrity against**

**Defendants Frumkin, Seney, Heatlie, Racine, Dworkin, Kendall, West and Schlissel**

The right to bodily integrity, including the right to be free from sexual assault, is protected by the substantive Due Process Clause. *Doe v. Claiborne Cty., Tenn. By & Through Claiborne Cty. Bd. of Educ.*, 103 F.3d 495, 506-07 (6th Cir. 1996). A municipal school district can be liable for promulgating a "deeply embedded policy" that causes a student to be subject to sexual assault. *Id.* As with the previous counts, Plaintiff has cited to no cases where this cause of action was successfully deployed against the individual supervisor of an assailant.

Indeed, Plaintiff pleads no allegations of individual conduct on behalf of specific defendants. He argues that the individual defendants maintained a custom that permitted his sexual assault. Maintaining a university custom, however, is, by definition, a collective action. U of M could be liable for its customs and practices if it were a municipality, but it is not. It is a state agency protected by the Eleventh Amendment, and § 1983 holds individuals liable for individual action, not for participating in the maintenance of customs that might expose municipalities to liability. To hold otherwise would both impermissibly expand § 1983 and diminish the Eleventh Amendment.

## C. **Counts II, III, IV(b), & VIII: Causes of Action arising from the OIE Report**

Plaintiff alleges that the OIE investigated his complaint in bad faith in order to slander his name and bolster the University's litigation defense. He pleads four counts arising from the report. None of them are meritorious.

### Count II: Title IX Disparate Treatment as against the University of Michigan

Plaintiff argues that the University's OIE investigation discriminated against him because he was a male. A student attacking a university disciplinary proceeding on grounds of gender bias can do so under Title IX under four theories: 1) erroneous enforcement, 2) selective enforcement 3) deliberate indifference 4) archaic assumptions. *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018). Defendants notes that Plaintiff's pleadings seem to proceed under theories of erroneous or selective enforcement, and that this cause of action is typically reserved for students accused of misconduct challenging a disciplinary proceeding. Indeed, all the relevant cases cited by Plaintiff involve respondents who alleged that they were discriminated against in their disciplinary proceedings. *See Doe v. Baum*, 903 F.3d 575, 585 (6th Cir. 2018); *Doe v. Cummins*, 662 F.App'x 437, 449 (6th Cir. 2016); *Doe v. Columbia Univ.*, 831 F.3d 46, 49 (2d Cir. 2016); *Doe. v. Ohio State Univ.*, 239 F.Supp.3d 1048; 1083 (S.D. Ohio 2017). Plaintiff seems to be asking the Court to find a novel cause

of action for complainants in school disciplinary proceedings to sue for gender discrimination.

He fails to establish a genuine issue of material fact as to the basic elements of such a cause of action, however. A student challenging the results of a disciplinary proceeding must show more than that the proceeding was flawed or that the Plaintiff felt himself to be the victim of discrimination. *Doe v. Cummins*, 662 F.App'x at 449; *Sahm v. Miami Univ.*, 110 F.Supp.3d 774, 778 (S.D. Ohio 2015). Rather, Plaintiff must show that the "University's actions "were motivated by his gender and that a similarly situated woman would not have been subjected to the same disciplinary proceedings." *Doe v. Univ. of the South*, 687 F.Supp.2d 744, 756 (E.D. Tenn. 2009).

Plaintiff has two grounds to demonstrate that female complainants are treated more deferentially than male complainants. The first is an anecdote told by Dean Racine in her deposition about a male professor who was swiftly sanctioned by the administration for telling inappropriate jokes. (Racine 132-136; PageId.8462-8463). Plaintiff argues that that professor was sanctioned because he was telling jokes that offended women, while Daniels went scot-free for telling jokes that may have sexually harassed men. The critical difference between the two cases, however, is that in the case of the female faculty members who heard the heterosexual professor's jokes, they reported the incident up the chain of command, whereas in

the case of Daniels, there is no evidence that anyone reported his inappropriate comments until the summer of 2018, at which point he was swiftly disciplined.

The second is a close reading of the OIE Report—Plaintiff labels this supplemental brief as Exhibit K—analyzing how OIE assessed the credibility of witnesses in the OIE report, compared to Lipian. That study labels a number of student witness in the OIE report as "non-litigants" or "non-litigants / females." (Dkt. 230-12). The study concludes that the OIE took these students at their word that they were harassed by Daniels, but they did not believe Lipian when he said that he was harassed.

By concluding that OIE believed even male witnesses over witnesses, Plaintiff's Exhibit K undercuts his Title IX gender discrimination claim. Exhibit K does not show males being treated worse than similarly situated females at all, because the majority of the witnesses that Plaintiff alleges were believed where Plaintiff was disbelieved were in fact males. Plaintiff cannot bolster his gender discrimination claim with the same evidence he uses to bolster his "class of one" claim, because proofs that the University believed other witnesses, men and women, but disbelieved Plaintiff, directly contradict allegations that the University believed women and not men.

Plaintiff might have a suspicion that the OIE Report might have read differently had he been a woman, but neither Exhibit K nor the Racine anecdote

provide any evidence to support this proposition. The Court will grant Defendants' Motion for Summary Judgment on Count II of the Third Amended Complaint.

### Count III: Title IX Retaliation, against the University of Michigan

"Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." *Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 173 (2005). A Title IX Retaliation claim requires Plaintiff to show that 1) he engaged in protected activity 2) of which the University was aware 3) that he suffered an adverse school-related action, and 4) that there was a causal connection between the protected activity and the adverse action. *Gordon v. Traverse City Area Public Schools*, 686 Fed.App'x 315, 320 (6th Cir. 2017). If Plaintiff succeeds in meeting all four requirements, the burden shifts to Defendant to articulate some legitimate, non-discriminatory rationale for its action. *Id.* The burden then shifts back to Plaintiff to show that the rationale is pretextual. *Id.*

Plaintiff's lawsuit is a protected activity of which the University was aware, but the OIE Report did not constitute an adverse action and there was no causal connection between the lawsuit and the report.

An action is adverse if it would dissuade a reasonable person in plaintiff's position from making or supporting a charge of discrimination. *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 71 (2006). Plaintiff argues that the OIE

Report is an adverse action because it portrays Plaintiff as a liar. He argues that the OIE clearly was not interested in his narrative of the facts, because they didn't even consider his deposition in preparing the Report. The OIE Report confronts this discrepancy by reasoning that the deposition was useless as a source because of "interruptions by attorneys" and differences in scope, format, questions, and nature of questioning. (Dkt. 230-3, pg. 12, PageId.7567). This justification is absurd, for the writer of the OIE Report would have to read the deposition in order to determine whether these problems render the whole deposition useless. The Report is obviously deficient for neglecting Lipian's 374 pages of sworn testimony.

The Report is also shockingly mean-spirited. Though its conclusions are non-judgmental, the anonymous student statements used as sources appear to go out of their way to impugn Lipian's character. The Court is deeply troubled that the University's response to a sexual harassment complaint is to publish a document filled with innuendo and rumor regarding the complainant's sexuality, lifestyle, and personality. The OIE has managed to demonstrate a callous disregard for both the privacy of its students and the integrity of its investigation.

Whatever its flaws, however, the OIE Report was not retaliatory. Even if a report alleging that a litigant is a liar would be sufficient to dissuade a reasonable person in a similar situation from filing or continuing the lawsuit, the OIE Report cannot be adverse because it does little to contradict Lipian's own characterization

of his relationship with Daniels in his deposition. Looking to the voluminous sexually inappropriate text messages, which "more commonly" were initiated by Daniels, the Report recognized that "a student may refrain from objecting to a professor's inappropriate behavior, or may even engage, for fear of retaliation and/or academic/career harm." (Dkt. 230-3, pg. 46, PageId.7601.). The OIE Report found, however, that this was not consistent "with the degree to which [Lipian] engaged with [Daniels] in a sexualized and social manner." (*Id.*). "The general nature of the interactions, however, appears fairly mutual with respect to sexualized banter." (*Id.*). Lipian testified that he had to play along with Daniels by making his communication look as genuine and mutual as possible, lest he find himself blackballed. (Lipian 74, PageId.8208).

Plaintiff cannot expect that, absent some interview testimony of his own, the sexual banter he deployed to fool Daniels into thinking that he welcomed his behavior would not also fool an outside investigator into perhaps suspecting the same. The Report outlined that the sexual harassment policy employs a presumption that sexual advances are unwelcome when between students and professors, but concludes that in this case "there is also substantial evidence that [Daniels] may have had sufficient reason in the context of the parties' frequent interactions, to understand his behavior to [Lipian] to be welcomed." (Dkt. 230-3, pg. 47, PageId.7602). The OIE Report's determination was that "the evidence available to

OIE is insufficient" to determine that Daniels knew or had reason to know that his conduct was unwelcome. It referenced a November 2016 sexualized joke Daniels made to Lipian, after which Daniels asked "too much? :)?" Lipian responded, "Honey we've been getting this shit drunk for six years, nothing is too much." (*Id.* at 48; PageId.7603). Even taken in the light most favorable to Plaintiff, the OIE Report does not endorse the position, as Plaintiff claims, that Plaintiff welcomed Daniels's advances. Indeed, the report makes clear that its findings "do[] not amount to a determination that [Lipian] subjectively welcomed the behavior." (*Id.*).

Even had the OIE Report qualified as an adverse action, Plaintiff has not provided an iota of evidence that the OIE wrote the report because Lipian filed suit. Margie Pillsbury testified that she terminated the law enforcement hold on October 11, 2018 when it became obvious that Lipian was not interested in becoming a criminal complainant. (Pillsbury 167, PageId.8366), That Pillsbury passed the baton to OIE around the time that Lipian filed his lawsuit does not support a finding that OIE began its investigation because Lipian filed suit. Nor does the fact that Lipian was the only student who alleged sexual harassment and who was made the subject of the report support a finding that Lipian was punished for filing a lawsuit. After all, Lipian was the only one to allege sexual assault against Daniels. His allegations against Daniels appear to be the most serious allegations confronted by the OIE.

Even if Plaintiff has managed to establish adverse action and causal relationship, he would still have to disprove Defendants' stated legitimate rationale. Defendants have advanced the position that The Office of Civil Rights ("OCR") of the Department of Education mandates investigations into allegations of sexual assault. OCR, September 22, 2017, Q&A on Campus Sexual Misconduct, available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf. Plaintiff has not met his burden to demonstrate that this rationale was pretextual.

Count III is properly dismissed under Rule 56, as there is no material dispute of fact as to the conclusions of the OIE Report, or the motivations of the OIE investigators. As discussed more fully on Count VIII, a contrary holding would recklessly tip the balance between the University's interest in maintaining its freedom of speech and students' interests in safeguarding their reputations and emotional stability. *See Smock v. Bd. of Regents of Univ. of Michigan*, 353 F. Supp. 3d 651, 659 (E.D. Mich. 2018). Universities would be unable to issue any discoverable report on allegations of sexual harassment, even a confidential one, without worrying that the report itself could expose it to Title IX liability.

**Count IV(b): Fourteenth Amendment Equal Protection—Gender and "Class of One" Defendants Frumkin, Seney, Heatlie, Racine, Dworkin, Kendall, West and Schissel**

Plaintiff also alleges that he was a "class of one" who was singled out for mistreatment. In order to plead out such a claim Plaintiff must "allege[ ] that [he]

has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 549 (6th Cir. 2007) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (holding that a property owner who was singled out and required to provide a 33-foot easement on their property pled an equal protection claim similarly situated property owners were required only to provide a 15-foot easement)). The class of one cause of action is available "where an equal-protection claim is not based on the government's burdening of a fundamental right or targeting of a suspect class." *Rondigo, L.L.C. v. Casco Twp., Mich.,* 330 F. App'x 511, 519 (6th Cir. 2009).

Plaintiff alleges that he was singled out as the only student who sued to receive his own Lipian-Daniels report, whereas the other witnesses who did not sue retained their anonymity and their credibility. Even if this were true, the individual defendants would be entitled to qualified immunity because none of the exceedingly rare "class of one" cases cited by the parties arise from the educational context. Plaintiff has cited to no case that does anything to put defendants on notice that issuing a report about events underlying a lawsuit brought by the complainant in an investigation could constitute a violation of the complainant's rights under the equal protection clause.

**Count VIII: 42 U.S.C. § 1983 First Amendment Retaliation, as against Defendants Frumkin, Seney, Heatlie, Racine, and Schlissel**

A First Amendment retaliation claim requires Plaintiff to plead that 1) he engaged in a constitutionally protected activity; 2) he experienced an adverse action that caused him to suffer an injury that would likely chill a person of ordinary firmness from continuing the activity; and 3) the adverse action was motivated at least in part as a response to the exercise of his constitutional rights. *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012).

This cause of action fails because the OIE Report was not an adverse action and was not retaliatory. Even if it were, qualified immunity bars recovery for alleged violations of constitutional rights that are not clearly established, and Plaintiff has produced no case law that would have put the individual defendants on notice that issuing a confidential University investigative report, whatever its conclusions and sources, could incur liability under § 1983.

Further, Plaintiff attempts to turn the First Amendment on its head. The OIE wrote a report based on its interpretations of the witness statements. To allow Plaintiff to proceed with a federal suit because he was offended by the report would give parties to university investigations what amounts to a federal libel remedy, with none of the standards and safeguards that prevent state libel laws from running afoul of the First Amendment. Such a cause of action would chill University investigative

reporters, who would be told that if their report cast a litigant in an unfavorable light, they may have to defend its conclusions in court.

## CONCLUSION

David Daniels came to the University of Michigan with all the prestige of one of the greatest countertenors of the age. Whether decision-makers at the University knew of his alleged proclivities towards exploiting power-dynamics with his students is unknown. Equally unknown is the nature of his relationship with Andrew Lipian, his promising protégé who arrived at U of M thrilled to be studying under Daniels and left feeling traumatized and betrayed.

Plaintiff is entitled to a trial on Count I—and Count I only—of his Third Amended Complaint. Taken in the light most favorable to Plaintiff, the evidence indicates that Daniels sexually harassed Lipian throughout the latter's tenure at SMTD. The evidence also makes a triable issue out of who at the University knew of Daniels's relationship with Lipian, and when. Finally, there are genuine questions of material facts as to the sufficiency of the University's responses to the notice provided. A jury's answer to these questions will determine the University's liability under Title IX for either maintaining a sexually hostile educational environment or enabling quid pro quo sexual harassment.

Accordingly,

**IT IS ORDERED** that Defendants' Motion to Dismiss [178] and Motion for Summary Judgment [203] are **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike [247] is **DENIED AS MOOT**.

**SO ORDERED**.

s/Arthur J. Tarnow
Arthur J. Tarnow

Dated: April 9, 2020        Senior United States District Judge